# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 25-707


**BILYTHA LAFAYE DRUILHET**

**VERSUS**

**MACE EUGENE COPELAND IV**

**********

ON APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20252533
HONORABLE DAVID A. BLANCHET, DISTRICT JUDGE

**********

**JONATHAN W. PERRY**
**JUDGE**

**********

Court composed of Shannon J. Gremillion, Jonathan W. Perry, and Guy E. Bradberry, Judges.


**AFFIRMED.**

Mace Eugene Copeland, IV
In Proper Person
1246 Doucet Lane, Unit B
Ville Platte, Louisiana 70586
(337) 307-6735
**DEFENDANT/APPELLANT**

Claire Bergeron Edwards
Claire Edwards Law Firm
Post Office Box 51845
Lafayette, Louisiana 70505
(337) 233-3616
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    Bilytha Lafaye Druilhet

Kimberly D. Svetlick
Attorney at Law
3861 Ambassador Caffery Parkway, Suite 300
Lafayette, Louisiana 70503
(337) 735-1760
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    Bilytha Lafaye Druilhet

Dene Thibeaux
Attorney at Law
718 South Buchanan Street, Suite C
Lafayette, Louisiana 70501
(337) 356-9355
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    Bilytha Lafaye Druilhet

**PERRY, Judge.**

This appeal involves a permanent Order of Protection, including an award of child custody and visitation granted under the provisions of La.R.S. 9:361–69, the Post-Separation Family Violence Relief Act ("Family Violence Act"). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Bilytha Lafaye Druilhet ("Ms. Druilhet") and Mace Eugene Copeland, IV, ("Mr. Copeland") were married on November 18, 2023. One child, B.L.C.,[1] was born on May 17, 2024. Ms. Druilhet and Mr. Copeland physically separated on or about January 22, 2025. Shortly thereafter Ms. Druilhet sought a Uniform Abuse Prevention Order ("Prevention Order"), protecting her from Mr. Copeland, who had been arrested for domestic abuse battery and child endangerment. At that time, Mr. Copeland was housed at the Lafayette Parish Correctional Center ("LPCC"). The trial court issued the Prevention Order on January 27, 2025.[2]

Fearing that Mr. Copeland might bond out of jail, Ms. Druilhet further filed a Petition for Custody and Temporary Ex Parte Custody on April 11, 2025, naming Mr. Copeland as the defendant. In her petition, Ms. Druilhet, contending that immediate irreparable harm or injury will result before a hearing can be held, sought an ex parte emergency order granting her temporary custody of B.L.C.. In her verified petition, Ms. Druilhet stated that Mr. Copeland: (1) had fought her while B.L.C. was held in her arms; (2) had struck her in the head causing her to be

---

[1] Initials are used here and throughout this opinion to ensure the confidentiality of minors. Uniform Rules—Courts of Appeal, Rule 5–2.

[2] A different trial court judge granted this initial Prevention Order. Mr. Copeland was provided with a copy of this order on January 27, 2025, and affixed his signature to it signifying receipt of the order. This Prevention Order terminated on January 27, 2026, and is not before us in this appeal.

hospitalized due to seizures caused by the strike; (3) had threatened to kill her and had written a suicide note; (4) had picked up B.L.C. from the bed and dropped her while he was choking Ms. Druilhet; and (5) stated to her that he was thinking of the most gruesome ways to kill them. In further support of her petition, Ms. Druilhet provided the third-party affidavit of Alyciea Spears who stated that Ms. Druilhet had recently been hospitalized due to damage from being domestically abused and that she had seen multiple bruises all over Ms. Druilhet's body. The trial court granted the ex parte emergency custody order; further ordered Mr. Copeland to appear on May 8, 2025, to show cause why Ms. Druilhet should not continue to have temporary custody of B.L.C.; and set a Hearing Officer conference for June 23, 2025.

On May 6, 2025, shortly after the issuance of the ex parte emergency custody order, Ms. Druilhet petitioned the court for protection from abuse pursuant to La.R.S. 46:2131. In her affirmed petition, Ms. Druilhet stated that: (1) on the night of January 22, 2025, Mr. Copeland punched her in the face while she was holding B.L.C.; (2) her mother, Frankie Druilhet, called the police when she heard Mr. Copeland strike Ms. Druilhet; (3) in prior incidents of violence, Mr. Copeland: (a) pushed her while she was in her third month of pregnancy, resulting in a ruptured tendon in her right foot; (b) struck her head in her fifth month of pregnancy, leaving a scar on her forehead; (c) choked her, tried to smother her, punched her in her eyes, and hit her in the head with belts and shoes; and (d) told her that no one comes before him in the marriage and she (Ms. Druilhet) could just die. On that same day, the trial court signed a Temporary Restraining Order pursuant to La.R.S. 46:2135 protecting Ms. Druilhet and B.L.C. from Mr. Copeland and further ordered Mr. Copeland to show cause on May 15, 2025, why the Temporary Restraining Order should not be made a Protective Order.

2

On May 8, 2025, the trial court held a show cause hearing to determine whether Ms. Druilhet should continue to have temporary custody of B.L.C. The record shows that Ms. Druilhet appeared in person at the May 8 hearing; Mr. Copeland did not attend the hearing.[3] Ms. Druilhet testified at the hearing, confirmed her prior allegations, and said the Lafayette Police Department had taken pictures of her injuries when Mr. Copeland was arrested in January of 2025. Ms. Druilhet further testified that Mr. Copeland had a prior conviction in August of 2023 when he choked her and that he was on probation when he was later arrested for the current charges of domestic abuse and child endangerment. Additionally, on examination by the trial court, Ms. Druilhet testified that Mr. Copeland had been arrested in 2016 on an aggravated assault charge and in 2023 for battery of a dating partner; in neither of these prior assaults was she the victim. At that time, Ms. Druilhet informed the trial court that: (a) she was a student; (b) she was living with her parents who assisted her with the care of her child and provided her with financial support; and (c) neither she nor her parents had been convicted of a crime of violence or had ever been investigated by the Department of Child and Family Services.

After hearing Ms. Druilhet's testimony and considering the record evidence, the trial court granted her temporary, sole custody of B.L.C. and provided supervised visitation to Mr. Copeland at the visitation center should he bail out of jail. At the end of the May 8 hearing, the trial court further stated:

> [L]et the minute entry reflect that Mr. Copeland is in jail at LPCC, that he made no request for a transfer order or to appear in open court today by Zoom, which was his prerogative to do. Since he did not do that, the court has moved forward with both hearings.

---

[3] The supplemental record shows that on April 15, 2025, personal service was made on Mr. Copeland of a Rule Nisi set for May 8, 2025. The following documents were attached: Petition for Custody and Temporary ex-parte custody; verification; third-party affidavit; ex parte emergency custody order; exhibits; and Hearing Officer conference and information.

On May 15, 2025, Ms. Druilhet and Mr. Copeland participated in a Hearing Officer Conference; Ms. Druilhet appeared in person, and Mr. Copeland participated via Zoom from LPCC. At the conclusion of that conference, the Hearing Officer found Mr. Copeland had physically abused Ms. Druilhet and recommended an eighteen-month protective order to be issued pursuant to La.R.S. 46:2135. When Mr. Copeland objected to the Hearing Officer's recommendation, the matter was reset before the trial judge and was scheduled to be heard on May 29, 2025.

On May 29, 2025, a hearing was held before the trial judge. Ms. Druilhet, accompanied by counsel, appeared in person and Mr. Copeland participated in proper person via Zoom from LPCC. After hearing the testimony of Ms. Druilhet and Mr. Copeland, the court stated:

> The Court finds that Ms. Druilhet is a very credible witness. Her testimony's extremely believable. She's even testified that she made false statements when obtaining disability because she was instructed by Mr. Copeland not to say the truth. So for her to come in here and admit that she lied on something, to cover up for him, makes her highly credible because she puts herself at risk in saying that.
>
> The Court also finds that Mr. Copeland's an extremely excitable person. In his testimony, he was almost breathless and getting more and more agitated as he spoke. The Court finds that there are multiple instances of domestic violence. The Court finds that this case calls for the Post-Separation Family Violence Relief Act. The Court will make the injunction permanent. The Court grants her sole custody of the minor child, that for Mr. Copeland to be able to visit with the child, he will have to undergo a 26-week program, domestic violence intervention program. He will also, in order to – if he wants to try to regain any kind of custody rights to the child, he will have to prove that he's not abusing drugs or alcohol. He will have to prove to the Court that it is in the best interest of the child that he become a custodian or a joint custodian, and he will also have to prove that he has completed the 26-week program.
>
> So [Ms. Druilhet] is awarded sole custody at this time. The Court awards him no visitation. If and when he gets out of jail, he can petition the Court and show the Court that he's completed his courses, and the Court will then consider whether he should have visitation at that time.

4

Accordingly, the trial court granted Ms. Druilhet a permanent Order of Protection (the "Order") pursuant to the provisions of La.R.S. 9:361–69, awarded her sole custody of B.L.C., and awarded no visitation to Mr. Copeland until he completes his 26-week domestic violence program and proves that it is in the best interest of B.L.C. that he becomes a custodian or a joint custodian. The Order further permanently protects Ms. Druilhet and B.L.C. from Mr. Copeland. As reflected in the record, Mr. Copeland was personally served with notice of this judgment on June 2, 2025.[4]

On June 26, 2025, Mr. Copeland filed a written motion for a new trial and further sought to recuse the trial judge due to prejudice or bias. The Clerk of Court held these motions in abeyance because Mr. Copeland failed to pay the court costs and could not provide the court with a properly notarized affidavit to support his request to proceed in forma pauperis because of his continued incarceration. After Mr. Copeland was released from incarceration on September 19, 2025, and submitted the properly notarized documentation, the trial court granted his request to proceed in forma pauperis. Thereafter, considering Mr. Copeland's post-judgment pleadings, the trial court denied the motions as being untimely.

On November 26, 2025, after his request to proceed in forma pauperis was granted, Mr. Copeland's earlier-filed motion for appeal of the Order signed on May 30, 2025, was also granted.

_____

[4] The record further shows that on June 11, 2025, Ms. Druilhet filed a petition for divorce from Mr. Copeland. On June 27, 2025, the trial court on its own motion ordered the divorce proceeding entitled "Bilytha Lafaye Druilhet v. Mace Eugene Copeland, IV" at Docket No. 2025-3071-H2 be consolidated with the domestic proceeding entitled "Bilytha Lafaye Druilhet v. Mace Eugene Copeland, IV" at Docket No. 2025-2533-H3.

On July 10, 2025, Mr. Copeland filed a petition for divorce from Ms. Druilhet. Later, on August 11, 2025, the trial court on its own motion ordered that the domestic proceeding entitled "Mace Copeland, IV v. Bilytha Druilhet" at Docket No. 2025-4295-H4, be consolidated with the domestic proceeding entitled "Bilytha Druilhet v. Mace Eugene Copeland, IV" at Docket No. 2025-2533-H3.

**APPELLEE'S MOTION TO STRIKE**

After the record was lodged in the appellate court and Mr. Copeland filed his appellate brief, Ms. Druilhet filed the following pleading in this court:

> **MOTION TO STRIKE THE CURRENTLY FILED BRIEF COMPLETED BY MACE COPELAND AND TO ORDER HIM TO FILE A NEW BRIEF BASED ON THE SUPPLEMENTED APPELLATE COURT RECORD,**
>
> **OR, ALTERNATIVELY,**
>
> **MOTION FOR MACE COPELAND TO AMEND HIS FILED BRIEF BASED ON THE SUPPLEMENTED APPELLATE COURT RECORD**

Contemporaneously with that motion, Ms. Druilhet moved to supplement the appellate record under Uniform Rules—Courts of Appeal, Rule 2–1.11 that provides:

> Subpoenas, notices, and returns may be omitted from the record, unless they are at issue. Prior to the submission of the case for decision, any party may move to supplement the record with the omitted items upon showing that the items are material to a decision in the case.

Ms. Druilhet specifically asked that this court order the district court to supplement the record with

> any/all proof of service of process, non-service of process, and any/all other subpoenas, notices, and returns, that may be made subject of Mr. Copeland's Assignment of Errors, which includes the entire District Court record from April 1, 2025 to December 2025, including the date of Ms. Druilhet's first filing to the date of the preparation and submission of the Record for Appeal. In no instance should the multiple April 15th and May 6th, 2025 notices for Mr. Copeland to attend court and/or have access to civil filings made against him be omitted from supplementation of the Appellate Court Record.

This court granted the motion to supplement the appellate record.

The law provides that the "lack of adequate notice implicates a procedural due process concern." *Flemming v. Flemming*, 13-22, p. 8 (La.App. 3 Cir. 6/5/13), 114 So.3d 1285, 1290, *writ denied*, 13-1624 (La. 11/15/13), 125 So.3d 1108. Due

6

process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Fairbanks v. Beninate*, 20-206, p. 13 (La.App. 5 Cir. 12/23/20), 308 So.3d 1222, 1232, *writ denied*, 21-250 (La. 3/23/21), 313 So.3d 272.

> [P]ersons whose rights may be affected by state action are entitled to be heard, and, in order that they may enjoy that right, they must first be notified. Equally fundamental is that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

*In re A.J.F.*, 00-948, p. 13 (La. 6/30/00), 764 So.2d 47, 55 (citations omitted).

Pursuant to this court's order, the district court supplemented the record with Sheriff Returns for April 23, 2025 (two Rules NISI and one citation); May 14, 2025 (Temporary Restraining Order (Protective Order) and one Rule NISI); May 21, 2025 (Special Citation); June 10 (Notice of Judgment); July 11 (Citation); and November 19, 25, and December 1, 2025 (Return Mail).

After Mr. Copeland reviewed the supplemented record, he included a supplemental brief, asserting, in part, the following points of contention:

> I. DENIALS OF MEANINGFUL PARTICIPATION
>
> Although Appellant received notice of the May 8, 2025, hearing he was incarcerated at the Lafayette Parish Correctional Center, a fact known to the trial court.
>
> The Court nevertheless proceeded in Appellant's absence without transport, remote appearance, or continuance.
>
> Appellant did not file any motion requesting to appear on May 8, 2025, nor did he file any motion requesting to appear on May 29, 2025. Despite this, the trial court exercised its discretion on May 29, 2025, to arrange Appellant's appearance via Zoom from the same facility.
>
> Nothing about Appellant's circumstances changed between May 8 and May 29. The same incarceration status existed, and the same institutional procedures were available.
>
> Accordingly, the failure to provide access on May 8 was not due to impossibility, but a failure of the [trial] court to exercise its discretion at a critical stage. This denial of participation was materially

7

prejudicial. Evidence was introduced, and rulings affecting custody and Appellant's rights were made in his complete absence.

Appellant was deprived of the ability to: **testify[;] cross examine witnesses[;] object to evidence[;] challenge unsupported allegations[.]**

This initial deprivation shaped the entire proceeding. By the time of the May 29 hearing, the record had already been developed without Appellant's participation. Due process requires not only notice, but a meaningful opportunity to be heard. The failure to provide such an opportunity renders the proceedings fundamentally unfair.

## II. LACK OF COMPETENT EVIDENCE SUPPORTING CUSTODY

The custody determination was not supported by competent evidence. The record contains no documentary evidence concerning the minor child, including: **no medical records[;] no child protection reports[;] no law enforcement documentation[;] no law enforcement evidence of harm or risk[.]**

## III. LACK OF RECORD PROOF OF VALID SERVICE OF FINAL ORDER

Even assuming Appellant received notice of earlier proceedings, the record fails to establish valid personal service of the final protection-from-abuse order.

There is no: **signed return of service[;] executed order bearing Appellant's acknowledgment[;] receipt or documentation confirming personal delivery[.]**

At most, the record suggests that the order may have been transmitted to the correctional facility. However, transmission to a facility does not constitute legally sufficient personal service.

## IV. STRUCTURAL DUE PROCESS FAILURE

This case reflects more than isolated procedural errors. The [trial] court: **proceeded without securing Appellant's participation[;] expanded the scope of the hearing without notice[;] abandoned its own custody procedure[;] relied on unsupported evidence[;] relied on demeanor despite communication limitations[.] These defects demonstrated a breakdown of the process itself.**

Based upon the supplemented record and Mr. Copeland's responsive brief, it is evident, except for his statement regarding the May 8, 2025 hearing, that his

allegation that he was not served with the various pleadings has been shown to be unsupported by the record. Regarding the May 8 hearing, we note that even though Mr. Copeland contends he was not present for that hearing, such assertion, even if true, is irrelevant because his appeal is solely from the judgment granted after the May 29, 2025 hearing—Mr. Copeland had notice of that hearing, and he actively participated in that adjudication. Clearly, Mr. Copeland's procedural due process rights have been met.

With the inclusion of the supplemental record and Mr. Copeland's response, we can accomplish the same result Ms. Druilhet requested. We will simply remove those portions of Mr. Copeland's assignments of error and argument that referenced the lack of service or notice and address the substance of the other issues identified therein. Therefore, we deny Ms. Druilhet's motion to strike Mr. Copeland's original brief and replace it with another.

**ASSIGNMENTS OF ERROR**

1. The trial court committed reversible legal error by issuing a permanent protection-from-abuse injunction in the absence of any immediate or ongoing threat, and based on speculative fear, where [Mr. Copeland] was incarcerated, already subject to criminal protective restrictions, and [Ms. Druilhet] delayed seeking relief.

2. The trial court committed legal error by exceeding the limited scope of a protection-from-abuse proceeding and adjudicating custody, visitation, and parental restrictions without pleadings, or the procedural safeguards required for custody determinations.

3. The trial court violated due process by adjudicating permanent custody and denying visitation at a hearing noticed solely for protection-from-abuse relief without pleadings, and without a best-interest analysis.

4. The trial court committed reversible error by sua sponte cancelling the hearing officer conference and bypassing the court-ordered custody procedure, thereby depriving [Mr. Copeland] of the process guaranteed by law and by the court's own order.

5. The trial curt committed reversible error by relying on an objected-to hearing officer recommendation and unsupported "waiver" findings, without conducting the required de novo review and while [Mr. Copeland] was incarcerated, unserved, and deprived of the opportunity to be heard.

6. The trial court violated [Mr. Copeland's] constitutional right to be heard by restricting his testimony, warning that his statements could be used against him criminally and then penalizing his limited testimony and demeanor in making adverse credibility findings.

7. The trial court committed reversible legal error by relying on pre-marital, non-family, and legally irrelevant allegations to establish a "history of family violence" and justify permanent protection-from-abuse and custody restrictions.

8. The trial court committed legal error by impermissibly stacking criminal, civil, and protection-from-abuse orders without statutory basis, new allegations, or evidence of intervening violations.

9. The trial court committed legal error by denying [Mr. Copeland's] Motion for New Trial and Motion to Recuse based on incorrect legal standards and improper self-adjudication of impartiality.

10. Even if this court were to conclude that no single assignment of error independently mandates reversal, the cumulative effect of the errors in this case deprived [Mr. Copeland] of fundamental fairness and due process.

## STANDARD OF APPELLATE REVIEW

A trial court is granted wide discretion in the issuance of protective orders. *Ned v. Laliberte*, 18-999 (La.App. 3 Cir. 6/26/19), 277 So.3d 517. A court of appeal reviews the issuance of domestic abuse protective orders for abuse of the trial court's discretion. *Fontenot v. Newcomer*, 10-1530, 10-1531 (La.App. 3 Cir. 5/4/11), 63 So.3d 1149. The trial court's finding of fact, including its assessment of the weight of the evidence, evaluation of the demeanor of the witnesses, and credibility determination, may not be disturbed on appeal absent manifest error. *Craig v. Bishop*, 19-166 (La.App. 3 Cir. 10/23/19), 283 So.3d 521; *Cummings v. Bishop*, 19-168 (La.App. 3 Cir. 10/23/19), 283 So.3d 507. To reverse the trial court's factual determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes the finding is clearly wrong. *Rabalais v. Nash*, 06-999 (La. 3/9/07), 952 So.2d 653. "Where the [fact-finder's] determinations] are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of

appeal is convinced that it would have weighed the evidence differently to reach a different result[.]" *Id*. at 657.

However, "when a trial court applies incorrect legal principles and these errors materially affect the outcome of the case and deprive a party of substantial rights, legal error occurs." *Vidrine v. Vidrine*, 17-722, p. 8 (La.App. 3 Cir. 5/2/18), 245 So.3d 1266, 1274 (citing *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731). When a trial court commits legal error, "the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Evans*, 708 So.2d at 735.

*Aguillard v. Aguillard*, 20-64, pp. 12–13 (La.App. 3 Cir. 11/4/20), 305 So.3d 955, 962 (alterations in original).

## LAW AND DISCUSSION

*Overview.*

The Family Violence Act is found in La.R.S. 9:361–69. "From a review of the Act as well as the case law, the apparent legislative intent in creating the Act was to protect victimized parties when domestic disputes arise in the course of separation and divorce." *State ex rel. S.D.K.,* 04-218, p. 5 (La.App. 5 Cir. 5/26/04), 875 So.2d 887, 890–91. Clearly, the Family Violence Act "was specifically designed to protect the child's interest by restricting the right of visitation of the abusing spouse in families with a history of family violence." *Michelli v. Michelli,* 93-2128, p. 5 (La.App. 1 Cir. 5/5/95), 655 So.2d 1342, 1346.

Louisiana Revised Statutes 9:364 provides, in pertinent part:

A. There is created a presumption that no parent who has a history of perpetrating family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, or has subjected any of his or her children, stepchildren, or any household member, as defined in R.S. 46:2132, to sexual abuse, as defined in R.S. 14:403, or has willingly permitted another to abuse any of his children or stepchildren, despite having the ability to prevent the abuse, shall be awarded sole or joint custody of children. The court may find a history of perpetrating family violence if the court finds that one incident of family violence

11

has resulted in serious bodily injury or the court finds more than one incident of family violence.

. . . .

E. If the court finds that a parent has a history of perpetrating family violence, the court shall allow only supervised child visitation with that parent pursuant to R.S. 9:341.

Louisiana Revised Statutes 9:362(4) defines family violence:

"Family violence" includes but is not limited to physical or sexual abuse and any offense against the person as defined in the Criminal Code of Louisiana, except negligent injuring and defamation, committed by one parent against the other parent or against any of the children. Family violence does not include reasonable acts of self-defense utilized by one parent to protect himself or herself or a child in the family from the family violence of the other parent.

As referenced in La.R.S. 9:364(A), domestic abuse is also defined in La.R.S. 46:2132(3) in pertinent part:

"Domestic abuse" includes but is not limited to physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another.

***Whether the trial court abused its discretion in its assessment of family violence and addressing custody and visitation in a protective order proceeding.***

In several of his assignments of error, all of which touch upon various elements of the hearing, Mr. Copeland argues that the trial court legally erred in these ways: (1) by relying on the hearing officer's finding without conducting a de novo review; (2) by adjudicating permanent custody and denying visitation at a hearing noticed solely for protection from abuse without pleadings and without a best-interest analysis; (3) by adjudicating custody, visitation, and parental restrictions in a protection-from-abuse proceeding; and (4) by issuing a permanent protection-from-abuse injunction in the absence of any immediate or ongoing threat

and based on speculative fear where he was already incarcerated, considering pre-marital instances of violence, and that Ms. Druilhet had delayed in seeking relief.

From the outset, Mr. Copeland contends that the trial court failed to conduct a de novo review and simply rubber-stamped the hearing officer's recommendation. It is self-evident that an appellant may not simply make an allegation in his brief without supporting his contention with references to the record. Uniform Rules—Courts of Appeal, Rule 2–12.4. Mr. Copeland has failed to support this assignment of error in any way. Accordingly, we find no merit to Mr. Copeland's assignment of error regarding de novo review.

Next, Mr. Copeland argues that it was improper for the trial court to address issues of custody and visitation in a protection-from-abuse proceeding, particularly when the pleadings did not alert him to those issues. For the following reasons, we find no merit to this argument.

Initially, we observe that the provisions of the Family Violence Act "become operative if the court finds that there has been family violence and that there is a history of family violence." *Melancon v. Russell*, 18-48, 18-49, pp. 6–7 (La.App. 5 Cir. 10/17/18), 258 So.3d 955, 960. "Neither the provisions of the [Family Violence Act] nor the caselaw requires that relief under this Act be specifically pleaded, where the allegations of abuse have been raised in the pleading or tried by the express or implied consent of the parties." *Id.* (citing *Dufresne v. Dufresne*, 08-215, 08-216 (La.App. 5 Cir. 9/16/08), 992 So.2d 579, *writ denied*, 08-2843 (La. 12/17/08), 996 So.2d 1123; and *Nettles v. Nettles*, 13-1164 (La.App. 1 Cir. 12/27/13), 2013 WL 6858325).

In the present case, the record shows that Mr. Copeland was served at various times with pleadings that identified the custody of B.L.C., sought to limit or exclude

his visitation rights, and requested the issuance of protective orders. Moreover, the record shows that Mr. Copeland not only participated in a Hearing Officer conference, but he also cross-examined Ms. Druilhet at the May 29 contradictory hearing and testified on his own behalf. At no time did Mr. Copeland argue that he did not know that the issues of custody, visitation, and protective orders would be addressed.

Next, Mr. Copeland argues that when the trial court addressed family violence, it improperly relied upon pre-marital allegations of family violence to support its determination and considered violence that did not involve Ms. Druilhet.

In *Durand v. Rose*, 22-300, p. 5 (La.App. 4 Cir. 9/15/22), 366 So.3d 484, 490, *writ denied*, 22-1727 (La. 1/18/23), 353 So.3d 127, it was observed:

> The provisions of the Family Violence Act "become operative if the court finds that there has been family violence and that there is a history of family violence." *Michelli*, 93-2128, p. 6, 655 So.2d at 1346; *Melancon v. Russell*, 18-48, pp. 6-7 (La. App. 5 Cir. 10/17/18), 258 So.3d 955, 960. Further, the Family Violence Act "only requires evidence of past events of family violence and does not require that the events be frequent or continuous." *Michelli*, 93-2128, p. 11, 655 So.2d at 1349.

First, we note that Mr. Copeland has only appealed the Order granted after the contradictory hearing held on May 29, 2025. Our review of the appellate record shows that no mention was made in that hearing of any arrests or actions involving Mr. Copeland that did not involve Ms. Druilhet. However, after we reviewed the record, we did find that in the hearing on May 8, 2025, Ms. Druilhet briefly referenced various instances where Mr. Copeland was arrested for battery of a dating partner and simple assault that did not involve her. On examination by the trial court, Ms. Druilhet was asked whether she was the victim in those instances. After Ms. Druilhet stated that she was not, no further reference was made to those arrests at the

May 8 hearing. Without having to address whether Mr. Copeland's acts of domestic violence against a dating partner other than Ms. Druilhet could have been considered at the May 29 hearing, we find no merit to Mr. Copeland's argument in this regard because they were not mentioned in the later hearing. We now turn our attention to the May 29 hearing and what evidence was presented.

The record of the May 29 contradictory hearing does show that Ms. Druilhet testified that on August 8, 2023, the Franklin Police Department arrested Mr. Copeland for choking her, bruising her body, and scaring her face; even though later testimony of Ms. Druilhet implies that Mr. Copeland was jailed after that arrest, the present record contains no evidence to support that implication with any specificity, including how long he was incarcerated. However, shortly thereafter, Ms. Druilhet, who was three months pregnant, told the court that on December 17, 2023, Mr. Copeland pushed her down, causing her to rupture her Achilles tendon; he then drove her to the hospital and forced her to tell the hospital staff that she was injured because she fell. Photographs of her injured foot were entered into evidence. Next, Ms. Druilhet described the events that occurred on October 8, 2024, as follows:

> It was almost the middle of the night. He started rambling on about me not sleeping under him. He got me up, and he pushed me outdoors in little to no clothing, and he said, "Let the mosquitoes eat you." So he locked me out of the house. And by the time he let me come back in the house, he started punching me in my head. He kicked me in my face. He punched me in my back. He kicked me in my back, and he just started beating me repeatedly.

Although Ms. Druilhet did not contact the police that day, her sister photographed the bruises on her back, and those photos were entered into evidence.

When asked if Mr. Copeland has ever frightened her, Ms. Druilhet answered affirmatively, telling the court:

15

> He has choked me, he has hit me in the head with – he has hit me in the head with belts, hit me in the head with shoes. He has put hot irons to my face. He has put his elbow in my jaw causing swelling. He has punched me in my eyes several times causing me to have black eyes.
>
> . . . .
>
> . . . . He said that he was thinking of the most gruesome way to kill me. He said he wanted me to die slowly in his arms. He threatened to kill himself. He wrote a suicide note. He would often tell me that he didn't know when he was just going to snap and just kill me that day. He would choke me a lot. He would choke me to the point where I would urinate on myself. I would beg him not to kill me in front of my daughter.

Lastly, Ms. Druilhet testified about events that took place on January 22, 2025, when Mr. Copeland punched her in the face while she was holding their eight-month-old daughter. After identifying photographs of the facial injuries she received that day, Ms. Druilhet stated:

> He was overly aggressive that day. He was looking for our daughter's Social Security card. He approached me while I was in the restroom. He told me that I was taking too long in the restroom, and he was going to seriously hurt me. By the time I got out of the restroom and went in the room with our daughter, he punched me in the face. I fell against the wall, and my mom called the police.

Immediately after Mr. Copeland was arrested and incarcerated that day, Ms. Druilhet sought protective orders from the court.

Specifically addressing Mr. Copeland's actions against B.L.C., Ms. Druilhet told the court that he picked his daughter up by her onesie, dropped her on the bed, and while she was flipped on her face, told Ms. Druilhet, "No one comes before me in the marriage, and she could just die."

Mr. Copeland aggressively cross-examined Ms. Druilhet on each instance of violence outlined above. At one point, Mr. Copeland was successful in getting Ms. Druilhet to affirm that she was not truthful to the hospital and Ochsner Medical Center, her employer, about when she tore her tendon on December 27, 2023, and

16

was compensated by her employer and Sun Life, the disability insurer. As part of that colloquy, Ms. Druilhet said: "[Y]ou told me you didn't want to go back to jail. You told me to tell the hospital that I fell. It was an injury regardless, whether you pushed me, it was an injury . . . You pushed me." Mr. Copeland then asked her, "[D]id you ever tell them that your disability claim was caused by me pushing you?" She responded, "No, I did not. I was afraid. I did not – I told them what you told me to say." Later, she also said, "I told them what you told me to say. . . . I did what you told me to do to stay alive."

At the conclusion of the hearing, the trial court stated:

> The Court finds that Ms. Druilhet is a very credible witness. Her testimony's extremely believable. She's even testified that she made false statements when obtaining disability because she was instructed by [Mr. Copeland] not to say the truth. So for her to come in here and admit that she lied on something, to cover up for him, makes her highly credible because she puts herself at risk in saying that.
>
> The Court also finds that Mr. Copeland's an extremely excitable person. In his testimony, he was almost breathless and getting more and more agitated as he spoke. The Court finds that there are multiple instances of domestic violence.

As noted earlier, appellate courts review the issuance of domestic abuse protective orders for abuse of the trial court's discretion. *Fontenot v. Newcomer,* 10-1530, 10-1531 (La.App. 3 Cir. 5/4/11), 63 So.3d 1149. "The abuse of discretion standard is highly deferential to the trial court's determination under consideration." *Patrick v. Ctr. for Restorative Breast Surgery, LLC*, 22-550, p. 7 (La.App. 4 Cir. 9/2/22), 348 So.3d 176, 180. In *Durkheimer v. Landry*, 22-418 (La.App. 3 Cir. 5/10/23), 366 So.3d 674, *writs denied*, 23-737, 23-797 (La. 10/3/23), 370 So.3d 1073, 1075, this court recognized that an abuse of discretion generally occurs in two instances: (1) if the trial court's determination is reached capriciously or in an

17

arbitrary manner; or (2) if a trial court's ruling is based on an erroneous view of the law.

In the present case, the trial court's judgment was neither arbitrary and capricious nor based on an erroneous view of the law. On the contrary, the trial court thoughtfully considered all the trial testimony and evidence, observed the demeanor of the witnesses, determined the credibility of the parties, and set forth detailed reasons for its judgment based on the law. After carefully reviewing the record, we find the trial court did not abuse its discretion in finding that the evidence showed that Mr. Copeland had demonstrated a history of violence toward Ms. Druilhet and B.L.C.

Lastly, Mr. Copeland complains that the trial court failed to conduct a best-interest analysis before granting custody of B.L.C. to Ms. Druilhet, denying him visitation, and imposing a permanent protective order.

To address Mr. Copeland's complaint, we must first review La.Civ.Code art. 134(B), La.R.S. 9:341, and La.R.S. 9:364.

Louisiana Civil Code Article 134(B) provides:

> In cases involving a history of committing family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, including sexual abuse, as defined in R.S. 14:403, whether or not a party has sought relief under any applicable law, the court shall determine an award of custody or visitation in accordance with R.S. 9:341 and 364. The court may only find a history of committing family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.

Louisiana Revised Statutes 9:341(A) provides:

> Whenever the court finds by a preponderance of the evidence that a parent has subjected any of his or her children or stepchildren to family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, has subjected any other household member, as defined in R.S. 46:2132, to a history of family violence as defined in R.S.

9:364(A), or has willingly permitted such abuse to any of his or her children or stepchildren despite having the ability to prevent it, the court shall allow only supervised visitation between the abusive parent and the abused child or children until such parent proves by a preponderance of the evidence at a contradictory hearing that the abusive parent has successfully completed a court-monitored domestic abuse intervention program, as defined in R.S. 9:362, since the last incident of domestic violence or family abuse. At the hearing, the court shall consider evidence of the abusive parent's current mental health condition and the possibility the abusive parent will again subject his children. stepchildren, or other household member to family violence or domestic abuse, or willingly permit such abuse to any of his or her children or stepchildren despite having the ability to prevent it. The court shall order visitation only if the abusive parent proves by a preponderance of the evidence that visitation would be in the best interest of the child, considering the factors in Civil Code Article 134, and would not cause physical, emotional, or psychological damage to the child. Should visitation be allowed, the court shall order such restrictions, conditions, and safeguards necessary to minimize any risk of harm to the child, including continued supervision. All costs incurred in compliance with the provisions of this Section shall be borne by the abusive parent.

Louisiana Revised Statutes 9:364(A), detailed more fully earlier in this opinion, creates a presumption that "no parent who has a history of perpetrating family violence . . . shall be awarded sole or joint custody of children." It further provides, in pertinent part:

> B. The presumption shall be overcome only if the court finds all of the following by a preponderance of the evidence:
>
> (1)The perpetrating parent has successfully completed a court-monitored domestic abuse intervention program as defined in R.S. 9:362, or a treatment program designed for sexual abusers, after the last instance of abuse.
>
> (2)The perpetrating parent is not abusing alcohol or using illegal substances scheduled in R.S. 40:964.
>
> (3)The best interest of the child or children, considering the factors listed in Civil Code Article 134, requires the perpetrating parent's participation as a custodial parent because of the other parent's absence, mental illness, substance abuse, or other circumstance negatively affecting the child or children.

C. The fact that the abused parent suffers from the effects of the abuse shall not be grounds for denying that parent custody.

D. If the court finds that both parents have a history of perpetrating family violence, custody shall be awarded solely to the parent who is less likely to continue to perpetrate family violence. In such a case, the court shall mandate completion of a court-monitored domestic abuse intervention program by the custodial parent. If necessary to protect the welfare of the child, custody may be awarded to a suitable third person pursuant to Civil Code Article 133, provided that the person would not allow access to a violent parent except as ordered by the court.

After reviewing La.Civ.Code art. 134(B), La.R.S. 9:341(A), and La.R.S. 9:364, it is evident that courts must conduct a best-interest analysis when family violence is involved. Even though such an analysis is required, it differs from the standard best-interest determination because it is constrained by statutory presumptions and mandatory restrictions. Indeed, the presumption that no parent with a history of perpetrating family violence shall be awarded sole or joint custody of children fundamentally alters the typical best-interest analysis by creating a threshold barrier. Accordingly, when cases involve a history of family violence, the court is required to determine custody or visitation awards in accordance with these specific provisions rather than applying the general best interest factors provided in La.Civ.Code art. 134(A).

In the present case, the trial court performed its duty as required in La.Civ.Code art. 134(B), La.R.S. 9:341(A), and La.R.S. 9:364. Accordingly, it determined that Mr. Copeland committed family violence involving his wife and young child, awarded sole custody of B.L.C. to Ms. Druilhet, and restricted his visitation until he successfully completed a court-monitored domestic abuse intervention program as defined in La.R.S. 9:362(3) and petitions the court for visitation. For the foregoing reasons, we find no merit to Mr. Copeland's argument.

***Whether the trial court improperly restrained Mr. Copeland's testimony at the hearing.***

The record shows that at the very beginning of the May 29 hearing, the trial court cautioned Mr. Copeland, who was incarcerated at the time and was representing himself, as follows:

> THE COURT: . . . So, Mr. Copeland, just so you understand – [t]his petition from abuse, it's based upon facts that caused [you] to be arrested.[5]

> So you do have the right to assert your Fifth Amendment right against self-incrimination if you choose to during the hearing. However, if you do choose to testify, whatever you say can be used against you in your criminal proceeding. Do you understand that?

> MR. COPELAND: Yes sir.

"The privilege [against self-incrimination] is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used." *Richey v. Richey*, 98-1195, p. 4 (La.App. 3 Cir. 3/10/99), 733 So.2d 618, 621, *writ denied*, 99-2122 (La. 10/29/99), 749 So.2d 639. "It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *State v. Johnson*, 432 So.2d 815, 816 (La.1983) (quoting *McCarthy v. Amdstein*, 266 U.S. 34, 45 S.Ct. 16 (1924)). A witness in a civil proceeding must submit to be called and sworn and to answer all questions except incriminating ones. The proper procedure is for the court to permit the witness to be called on cross-examination and to invoke the privilege after each question is asked so that the court may rule as to whether the question is incriminating. *La. Livestock*

---

[5] The record is void of any evidence of whether Mr. Copeland was convicted, when that conviction occurred, and of what charge he was convicted or to what charge he pleaded guilty.

*Sanitary Bd. v. Pickett,* 323 So.2d 521, 524 (1975); *Lamartiniere v. Dep't of Emp. Sec.,* 372 So.2d 690, (La.App. 1 Cir.), *writ denied,* 375 So.2d 945(La.1979).

Louisiana Code of Judicial Conduct, Canon 3(A)(4), in pertinent part, provides, "A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the abilities of all litigants, including self-represented litigants, to be fairly heard[.]" In the present case, it is clear that the trial court advised Mr. Copeland of an evidentiary element that could have adversely affected him and made that concept understandable in a concrete manner. *See* Commentary to Canon 3(A)(4), Sections (2) and (4). After hearing that advice, Mr. Copeland assented to that caution, actively participated in cross-examining Ms. Druilhet, and chose to testify on his own behalf. At no time did Mr. Copeland invoke his privilege not to self-incriminate himself in this civil proceeding even though he had a right to do so. Moreover, Ms. Druilhet never called Mr. Copeland as a witness under cross-examination. Accordingly, Mr. Copeland has failed to show that the trial court curtailed his presentation of evidence in any way. Therefore, we find no merit to Mr. Copeland's assignment of error.

### *Whether the trial court erred in denying his motion for a new trial as well has his motion to recuse the judge.*

Mr. Copeland contends that the trial court erred when it denied his motion for new trial. On November 4, 2025, the trial court denied the motion for new trial stating that the motion was unsigned and untimely. Under the provisions of La.Code Civ.P. art. 1974, the delay for applying for a new trial is "not later than seven days, exclusive of legal holidays, after the clerk has mailed or delivered in open court, or the sheriff has served, the notice of judgment as required by Article 1913." As evidenced by the supplemental record, Mr. Copeland was personally served with

22

judgment on June 2, 2025, at LPCC. The record shows that Mr. Copeland did not file his motion for new trial until June 28, 2025. Without addressing Mr. Copeland's failure to sign his motion for new trial, it is abundantly clear that his new trial motion was untimely. Accordingly, we find no error in the trial court's denial of the motion for new trial.

Mr. Copeland further maintains that the trial court legally erred when it denied his motion to recuse the trial judge. Louisiana Code of Civil Procedure Article 154(A) states:

> A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusal under Article 151. This motion shall be filed no later than thirty days after discovery of the facts constituting the ground upon which the motion is based, but in all cases prior to the scheduling of the matter for trial. In the event that the facts constituting the ground upon which the motion to recuse is based occur after the matter is scheduled for trial or the party moving for recusal could not, in the exercise of due diligence, have discovered such facts, the motion to recuse shall be filed immediately after such facts occur or are discovered.

In the present case, Mr. Copeland did not file his motion to recuse the trial judge until *after* the trial was completed. Accordingly, under Article 154(A), Mr. Copeland was required to allege the facts he could not have discovered, in the exercise of due diligence, on which he relies to support his recusal motion.

In written reasons, the trial court stated:

> The recusal motion filed by [Mr. Copeland] fails to state grounds for the recusal under La. C.C.P. Art. 151. Essentially [Mr. Copeland] disagrees with the Court's ruling and view of the evidence, but provides no facts to support that the undersigned Judge[] is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against him. Further, La. C.C.P. Art. 154(A) provides that if the motion to recuse is filed after the matter has been set for trial ". . . the motion to recuse shall be filed immediately after such facts occur or are discovered." The grounds upon which [Mr. Copeland] bases his recusal motion is the court's ruling at the hearing of this matter on May 29, 2025. The recusal motion was not filed by [Mr. Copeland] until June 26, 2025. As such, the recusal motion is untimely.

23

After reviewing Mr. Copeland's motion and the trial court's reasons to deny the recusal motion, we find no merit to Mr. Copeland's assignment of error.

***Whether the cumulative effect of the legal errors demands reversal.***

Mr. Copeland asserts that even if we were to conclude that no single assignment of error independently mandates reversal, the cumulative effect of the errors in this case requires us to reverse the trial court judgment.

Initially, we note that Mr. Copeland has not cited any jurisprudence to support the application of the cumulative error doctrine[6] to civil cases. In the present case, we have found no errors that fatally infected the fundamental fairness of this trial and none that might be cumulated. *See State v. Reeves*, 18-270 (La. 10/15/18), 254 So.3d 665, (citing *Mullen v. Blackburn*, 808 F.2d 1143 (5th Cir. 1987) (stating that there is no basis for reversal in the case because "twenty times zero equals zero")). Therefore, having found no merit to Mr. Copeland's assertion that legal errors existed in the trial court's individual rulings, we find no merit to his final assignment of error.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Mace Eugene Copeland, IV.

**AFFIRMED.**

---

[6] The few cases that have discussed the cumulative error doctrine have involved criminal appeals and have been based on multiple harmless errors. *See, e.g.*, *U.S. v. Lara*, 23 F.4th 459 (5th Cir. 2022), *cert. denied*, --- U.S. ---, 142 S.Ct. 2790 (2022); *State v. Santiago*, 23-501 (La. 5/10/24), 384 So.3d 879 (Weimer, J., dissenting); *Hayden v. Boutte*, 22-244 (La.App. 5 Cir. 7/2/25), 420 So.3d 98, *writ denied*, 25-954 (La. 11/19/25), 420 So.3d 1181. In *Lara*, 23 F.4th 459, the court stated that the cumulative error doctrine is rarely applied and in circumstances where the errors fatally infected the trial and violated the trial's fundamental fairness.